F. W. Leadbetter v. Commissioner. Caroline P. Leadbetter v. Commissioner.
Leadbetter v. Commissioner
Docket Nos. 110258, 110259.
United States Tax Court
1943 Tax Ct. Memo LEXIS 153; 2 T.C.M. (CCH) 626; T.C.M. (RIA) 43387; August 13, 1943
*153 C. D. Phillips, Esq., 805 Electric Bldg., Portland, Ore., for the petitioners. T. M. Mather, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax for the year 1938 as follows: F. W. Leadbetter, docket No. 110258, $14,849.98; Caroline P. Leadbetter, docket No. 110259, $21,540.06. The deficiencies are contested in part. The questions in issue are: (1) Whether petitioners realized taxable income upon the transfer of certain stock by F. W. Leadbetter in exchange for securities owned by the Pittock Leadbetter Company. (2) Whether petitioners realized taxable income upon the transfer of certain stock by F. W. Leadbetter in satisfaction of his indebtedness to Pittock Leadbetter Company. (3) Whether petitioners received interest from Pittock Leadbetter Company during the year 1938. Petitioners filed separate returns with the collector for the district of Washington, in which they reported income on the community property basis. Findings of Fact Petitioners are husband and wife, residing in Camas, Washington. As the issues involved relate solely to transactions consummated by one of the petitioners, *154 F. W. Leadbetter, he is referred to hereinafter as the petitioner. Issue 1. For the past 45 years, petitioner has been engaged in building, operating, and selling paper mills. In 1925, the Leadbetter Lumber & Paper Company, hereinafter called Leadbetter Company, was organized as a personal holding company by petitioner. In that year, he transferred various tracts of real estate and various stocks to the company in exchange for 25,575 shares of its common stock of a par value of $100 per share. The property was transferred at a value of $3,711,888.57, and was carried on the company's books at that value. On September 1, 1938, the Leadbetter Company and petitioner owned a majority of the common stock of the Columbia River Paper Co., which was a holding company for two paper manufacturing companies, known as the Columbia River Paper Mills and the Oregon Pulp and Paper Company. The financial structure and the capitalization of all of these companies are as follows: [SEE TABLE IN ORIGINAL]
COLUMBIA RIVER PAPER CO.
Bonds
None outstanding
First Preferred 7% Cum
None outstanding
26,796 shares (52.75%)
Second Preferred 6% Cum
50,734 shares outstanding - 16 1/2%
held by Public; 83 1/2% held
privately
Common
35,215 shares outstanding - 81%
held privately; 19% held by
Public
16,577 shares (47% plus)
4,434 shares (12 1/2%)
*155 LEADBETTER LUMBER & PAPER COMPANY
F. W. Leadbetter, personal
Bonds
None
Preferred, 8% Cum
6,754 shares
Common
28,080 shares
All family owned
As of September 1, 1938, the Leadbetter Company had outstanding 6,754 shares of 8 percent cumulative preferred stock, and 28,080 shares of common stock. There were unpaid and accrued dividends in the amount of $563,930.75 on the preferred stock. The balance sheet of the Leadbetter Company as of September 1, 1938, showed total assets in the amount of $3,947,926.69, liabilities in the amount of $362,749.51, and "net worth" in the amount of $3,585,177.18. The assets of the company as they were carried on its books and the fair market value of those assets as of September 1, 1938, are as follows: LEADBETTER LUMBER & PAPER COMPANY
September 1, 1938
ASSETS
Per Books
Fair Value
Cash
$ 308.35
$ 308.35
Accounts receivable
4,439.40
4,439.40
Livestock
910.00
910.00
Real Estate: Mocks Flats
Peninsula property
412,621.26
199,061.46
Union Avenue property
3,500.00
Santa Barbara
33,600.00
33,600.00
Investments: Columbia River Paper Mills - 5% Income
Bonds - Par value $169,260
$ 112,722.50
112,722.50
Chas. K. Spaulding Logging Co. Stock -
11,250 shares
Columbia River Paper Co. stock
1,448,125.00
125,051.53
2nd Preferred - 5,450 shares
Common - 5,000 shares
2nd Preferred - 21,346 shares
1,698,028.15
1,628,699.80
Common - 11,577 shares
Per Books
Fair Value
Pittock Leadbetter Company
Common - 900 shares
90,000.00
90,000.00
Preferred - 353 shares
35,300.00
35,300.00
California-Oregon Paper Mills - 4% 1st
Mortgage Bonds - Par value $15,750
7,481.87
7,481.87
Vancouver Kraft Co. Ltd. Note
100,000.00
100,000.00
Port Mellon Operating Co. stock
Total Investments
3,491,657.52
Prepaid expense
565.01
Organization expense
3,825.15
Total Assets
$3,947,926.69
$2,756,909.91
*156 According to the company records, the preferred stock with its accumulated unpaid dividends had an equity value of $1,239,330.75. The book value of the common stock was $83.09 per share. The stock of the Leadbetter Company is owned principally by petitioner, his wife, and their children. It is not listed on any exchange and prior to September 1, 1938, none of the stock had ever been sold. As of December 31, 1938, the assets of the Columbia River Paper Co. and its subsidiary companies were carried at a book value of $8,220,058.26. The total liabilities of these companies were in the amount of $3,727,670.30. The outstanding preferred stock of the Oregon Pulp and Paper Company and the Columbia River Paper Mills, together with the dividends which had accrued thereon, amounted to the sum of $659,536.67. According to the books of the Columbia River Paper Co., the equity of $3,832,851.29 was attributable to the preferred stock which had a book value of $76.30. The earnings of the Columbia River Paper Co. for the years 1936 to 1941, inclusive, and the retirement of its first mortgage bonds in that period are as follows: PREFERRED
COMMON
FIRST MORTGAGE
BONDS
Consolidated
Consolidated Earnings
Earnings
per share
per share
Before
After
Before
Income
Income
Income
Consolidated Record of
Taxes
Taxes
Taxes
Debt Retirement
1936
$ .28(d)
$ .78(d)
$ 9.06(d)
Outstanding
$1,613,000.00
1937
2.85
2.12
4.57(d)
Outstanding
1,755,000.00
1938
6.39(d)
6.39(d)
17.66(d)
Outstanding
1,649,412.50
1939
2.90(d)
2.90(d)
12.71(d)
Outstanding
1,539,000.00
1940
11.13
7.48
7.32
Outstanding
1,411,400.00
1941
28.93
13.66
32.71
Outstanding
1,280,400.00
(d) - Deficit
*157 The common stock equity of the Leadbetter Company in the earnings of the Columbia River Paper Co. for the years 1938 to 1941, inclusive, are as follows: Common stock equity in earnings of Columbia River Paper Co. before taxes but after Leadbetter Lumber & Paper Company preferred earnings and after expenses and losses of Leadbetter Lumber & Paper Company: Earnings per
share Common
Year
before Taxes
1938
$ 8.01(d)
1939
4.70(d)
1940
4.48
1941
23.04
(d) - Deficit
The condition of the paper manufacturing industry had been depressed for several years prior to 1938. However production commenced to rise during the late summer and fall of 1938 and the outlook for business improvement in the paper industry on September 1, 1938, was good. On September 1, 1938, the Pittock Leadbetter Company, hereinafter called the Pittock Company, executed a bill of sale, which, inter alia, stated: * * * that we, PITTOCK LEADBETTER COMPANY, a corporation organized under the laws of the state of Washington, in consideration of 1400 shares of the common stock of the Leadbetter Lumber & Paper Company at a par value of $100.00 a share, the receipt of which is hereby acknowledged, have *158 bargained and sold to F. W. LEADBETTER the following shares of stock in the specific quantities and at the prices stipulated * * * The stock which was sold to petitioner was listed in the bill of sale in certain blocks at stipulated prices, as follows: No. of
Shares
5,000
Crown Zellerbach Corp.,
Common
$ 34,431.80
100
Crown Zellerbach Corp.,
Preferred
2,451.08
100
International Paper &
Power Co., Preferred
2,886.96
100
International Paper &
Power Co., Common
433.04
300
Virginia-Carolina Chem.
Corp., Preferred
8,422.50
400
New York Central RR.
9,882.50
2,000
Southern Pacific Company
41,075.00
1,500
Southern Railway
21,582.50
500
International Agric. Corp.,
Preferred
18,150.00
Total
$139,315.38 This stock had a fair market value of $150,682.50 on September 1, 1938. The Pittock Company was a personal holding company, the shares of which were owned by petitioner, his wife, and their children. Petitioner was the president, and controlled the activities of the Leadbetter Company, the Pittock Company, the Columbia River Paper Co., the Oregon Pulp and Paper Company, and the Columbia River Paper Mills Company. None of the stocks of these companies *159 were listed on any exchange. The fair market value, on September 1, 1938, of the Leadbetter Company's net assets was $2,394,160.40. The fair market value of the 6,754 shares of preferred stock together with the unpaid dividends thereon was $1,239,330.75. The fair market value of its 28,080 common shares was $1,154,829.65, or $41.12 per share. The transaction under which petitioner transferred 1,400 shares of Leadbetter Company common stock to the Pittock Leadbetter Company in exchange for securities owned by that company was a distribution by the Pittock Leadbetter Company to petitioner of $93,114.50 of its capital assets, from which petitioner realized taxable income of $62,814.50. Issue 2. On September 24, 1938, petitioner was indebted to the Pittock Company in the sum of $21,121.39. On that date, petitioner transferred 212 shares of Leadbetter common stock of a fair market value of $8,717.44 to the Pittock Company in full satisfaction of his indebtedness. There was no intention on the part of the Pittock Company to gratuitously forgive any part of the indebtedness. Petitioner realized taxable income in the sum of $12,403.95 as a result of this transaction. Issue 3. *160 On December 4, 1929, the Pittock Company executed and delivered a note to petitioner in the amount of $35,866.33. In 1935, the note was sold to the Leadbetter Company at its face value. At the time of the sale, interest had accrued on the note in the amount of $9,311.96. However, the accrued interest was not transferred with the note but remained on the Pittock Company's books as a liability owed to petitioner. In November of 1939, there was a merger of the Pittock Company and the Leadbetter Company. Upon the merger, the Leadbetter Company assumed the liability of the accrued interest. The liability remained on the books of the Leadbetter Company until 1940, during which year it was paid by the transfer of some securities and the adjustment of various accounts between the Leadbetter Company and petitioner. Respondent determined that petitioner received interest in the above amount during the year 1938, but no explanation was given for this determination in the statement attached to the deficiency notice. The interest was not income to petitioner in 1938. Opinion Issue 1. The question under this issue is whether petitioner realized taxable income in 1938 as a result of the *161 exchange by him of 1,400 shares of common stock of the Leadbetter Company for securities owned by the Pittock Company. Both companies are personal holding companies, owned by petitioner and his immediate family. Respondent contends that the receipt by petitioner of the securities of the Pittock Company was a distribution within the terms of section 115 (d) of the Revenue Act of 1938; [1] that the fair market value of the securities transferred by the Pittock Company to petitioner, on September 1, 1938, was $150,682.50; that the basis of the Pittock Company stock to petitioner was $30,300; and that the Leadbetter stock had no fair market value. He, therefore, asserts that petitioner realized a gain of $120,382.50 on the transaction, of which $92,570.13 represents a capital gain. Petitioner does not contest respondent's valuation of the securities transfered by the Pittock Company nor the basis of the Pittock Company stock owned by him. *162 Petitioner's contention is that the transaction was not a distribution but a sale, and that the Pittock Company received a full consideration for its securities in that the Leadbetter stock was equal in value to the securities received by him. He also advances the alternative contention that even though the Leadbetter stock was not equal in value to the securities received from the Pittock Company, the transaction cannot be considered a distribution within the scope of section 115 (d). Neither petitioner nor respondent has cited any authority in support of his respective position. Petitioner's argument, however, is based upon the reasoning of , which involved the question as to whether a sale of corporate property to a stockholder for less than its fair market value was a distribution of corporate earnings and profits taxable as a dividend. Petitioner claims that the Palmer case establishes the rule that the sale of corporate property to a stockholder for less than its fair market value does not cause the stockholder to realize taxable income, but that the price paid by the stockholder becomes his basis for *163 determining gain or loss. In this case, the issue is not whether the Pittock Company distributed a dividend. The record does not indicate whether that company had any earned surplus available for dividend distribution. The issue here is whether the Pittock Company made a distribution pursuant to section 115 (d). Although we agree with petitioner that the rationale of the Palmer case is applicable to this proceeding, we cannot agree that it supports petitioner's contention. The Court in that case took particular pains to point out that at the time the corporation committed itself to the sale of certain stock to its stockholders, the price which it was to obtain for the stock represented its fair market value. In the course of its opinion, the Court said: On the other hand, such a sale, if for substantially less than the value of the property sold, may be as effective a means of distributing profits among stockholders as the formal declaration of a dividend. The necessary consequence of the corporate action may be in substance the kind of a distribution to stockholders which it is the purpose of section 115 to tax as present income to stockholders, and such a transaction *164 may appropriately be deemed in effect the declaration of a dividend, taxable to the extent that the value of the distributed property exceeds the stipulated price. * * * In , the Fourth Circuit specially stated: * * * In the case of ordinary sales, there is no point in distinguishing between market value and sale price; but, where there is a sale to stockholders below market value, this is in effect a distribution among stockholders and the price obtained is not determinative in computing income, a part of which is thus distributed. * * * In , the Circuit Court said: * * * It is of no importance that the transfer assumed the form of a sale and that there was no express declaration of a dividend. The substance of the transaction determines its character for purposes of taxation; and we need only inquire whether the Columbia corporation transferred to the taxpayer and its other stockholders without cost a part of its earnings and profits so that they were severed from and ceased to be a part of the corporate property in which *165 the stockholders had an indirect undivided interest and became their separate and independent holding, of which they could dispose at will. * * * The court stated in that case that its conclusion is clearly indicated by the principles enumerated in , wherein the Supreme Court pointed out that a sale of corporate assets, if made for substantially less than the value of the property sold, is as effective as the formal declaration of a dividend to stockholders, if in its purpose or effect, it actually brings about a distribution of corporate earnings among them. Referring to , and , which are relied upon by petitioner in this case, the Court said that as they were rendered prior to the decision of the Supreme Court in , they must be disregarded insofar as they differ from the rule there announced by the Supreme Court. The principles enunciated in these cases as to a distribution of corporate earnings and profits upon *166 a sale of corporate assets to stockholders are equally applicable to a distribution of capital assets to stockholders pursuant to section 115 (d). The obvious purpose of section 115 and its subdivisions is to provide for the taxation to corporate stockholders of all gains derived by them as distributions based on their stockholdings and to provide a complete plan whereby such gains, if not taxable as dividends, may be subject to tax as ordinary gains. ; affd., . We have no doubt that a sale of corporate assets to a stockholder for less than their fair market value may amount to a distribution of capital within the scope of section 115 (d). In this connection, it is pertinent to ascertain the intent or purpose of the particular transaction. Petitioner in this case was not dealing at arm's length with the Pittock Company. That company, as well as the Leadbetter Company, was controlled and dominated by him. He was president of both companies. The stock of those companies was owned by petitioner and his immediate family. Therefore, the intent of the Pittock Company must be determined *167 by petitioner's intent. Petitioner testified that it was contemplated that the Pittock Company and the Leadbetter Company would merge and he thought that the exchange of securities would facilitate that merger. However, since both companies were owned by the Leadbetter family, the merger could have been as well accomplished without the exchange. The record indicates that the real purpose of the transaction was to improve petitioner's financial standing with lending institutions. The securities received from the Pittock Company were listed securities having a recognized value and could be pledged as security for loans. The Leadbetter stock was of little value as such collateral. There can be little doubt that the purpose of the exchange was not to benefit Pittock in any business way but was for the sole personal benefit of petitioner. Under the circumstances, a transaction of this nature is a distribution of capital assets unless the Pittock Leadbetter Company received full consideration for its securities. This brings us to petitioner's principal argument that the Leadbetter stock transferred by him was equal in value to the securities received from the Pittock Company. Petitioner *168 claims that the Leadbetter common stock had a fair market value of $100 per share. Respondent contends that it had no fair market value. There is no definite formula by which fair market value can be determined. . It is a question of fact to be determined from all of the evidence, . The generally accepted definition of "fair market value" is the price at which a seller, willing to sell at a fair price, and a buyer, willing to buy at a fair price, both having reasonable knowledge of the facts, will trade. As a general rule, the best evidence of fair market value of stock is the price at which it is bought and sold on the open market; , certiorari denied, ; ; ; ; ; ; *169 but market value may exist independent of sales. ; ; . "The value of shares in a commercial or manufacturing company depends chiefly on what they will earn, on which balance sheets throw little light." . However, in estimating the value of common stock of a corporation where there are no sales, the value of the net assets of the corporation have an important bearing. . Respondent predicates his assertion that the Leadbetter stock had no fair market value on September 1, 1938, on certain isolated sales of securities of the subsidiary companies. His two witnesses were traders in securities of this nature, buying from dealers and selling to other dealers. The witness, Courtney, testified that on September 15, 1938, 60 units of Columbia River Paper Co. stock were sold for $7.50 *170 per unit. The unit comprised of 1 1/2 shares of preferred stock, and one share of common stock. This was the only sale about which the witness could testify. According to the stock transfer books of the Columbia River Paper Co., there was no such transfer recorded in September 1938. The witness, Collins, testified as to one sale which occurred in June 1937 and one sale in September 1939. He also testified as to one sale of Columbia River Paper Mills, 5 percent income bonds in August 1938, at a price of $26.50 per $100 bond. His testimony was that the securities of the subsidiary companies were inactive. They were not listed on any exchange. It is well established that evidence of isolated sales involving only a small portion of capital stock do not establish fair market value. ;; . We do not believe that these sales reflect the fair market value of the securities of the subsidiary companies. All of petitioner's witnesses *171 predicated their value of $100 per share of the Leadbetter common stock on the fact that the company controlled the operating companies. Petitioner testified that he could have sold control of those companies for at least $3,000,000. However, the fallacy of this argument is that the sale of 1,400 shares of the stock would in no way change control of those companies. The Leadbetter Company owned 52.75 percent of the preferred stock and 47 percent of the common stock. Petitioner owned 12 1/2 percent of the common stock prior to the transfer, and 8 1/2 percent after the transfer. Thus it is apparent that the transfer of 1,400 shares by petitioner did not affect control of the operating companies. Petitioner retained that control as effectively after the transfer as he did prior to the transfer. Upon due consideration of all of the evidence, we believe that petitioner's estimate of a value of the Leadbetter common stock of $100 per share is too high, and, also, that respondent's contention that the stock had no fair market value is not sound. Under such circumstances, it is our duty to determine from all of the evidence a fair market value of the stock somewhere between the two extremes, *172 if that is possible. There are two factors which may be considered, earnings and the fair market value of the underlying assets. Our study of the testimony and of all the facts and circumstances pertaining to the Leadbetter Company and its subsidiary operating companies leads us to the conclusion that the earnings of those companies in the several years prior to 1938 do not furnish any reliable criterion for the fair valuation of the stock in question. During that period the paper industry had been depressed, and as a result the companies showed a net loss in their operations. Dividends had accumulated on the preferred stock to a considerable extent. However, on September 1, 1938, the outlook for the future was good; inventories of paper stocks had declined to such a degree that increased protection was anticipated. That this outlook was not unduly optimistic is reflected in the excellent earnings of the companies in the subsequent years. Where, as in this proceeding, there have been no sales of the stock of a close corporation and because of the fact that the earnings do not reflect a true indication of the fair market value of the stock, we may look to the fair market value of *173 the assets underlying the stock to ascertain the value thereof. [2] On brief, both parties have relied largely on this method for determining the value of the Leadbetter stock. The controversy arises on account of the difference of opinion as to the value of those assets, particularly with respect to the value of the securities of the operating companies held by the Leadbetter Company.
The book value of the underlying assets of the Leadbetter Company indicated *174 that the common stock of that company had a book value of $83.09 per share as of September 1, 1938. That value was based upon the cost of the assets to the company. However, petitioner's witness, Donnelly, who was the auditor of the Leadbetter Company and the subsidiary companies, adjusted the book value to arrive at the fair market value of the assets. In doing this, each asset was carefully analyzed and given a fair market value. We believe that the statement of the fair market value of those assets as prepared by Donnelly represents their true fair market value. Petitioner who was president of all the companies, and the person most familiar with their affairs, corroborated Donnelly's statement as to the fair market value of each of the underlying assets. However, he attempted to increase the value of those assets by showing that control of the operating companies could be sold for $3,000,000. For reasons set forth above, the latter argument has been rejected. However, it is our opinion that petitioner has proved that the Leadbetter common stock had a fair market value on September 1, 1938 of $41.12 per share. Upon all the evidence, it is our conclusion that the stock of the Leadbetter *175 Company had a fair market value equivalent to the fair market value of its underlying net assets. We have therefore concluded and found as a fact that the fair market value of the Leadbetter Company's net assets on September 1, 1938, was $2,394.160.40. The preferred stock equity on that date was $1,239,330.75, leaving an equity for the common stock of $1,154,829.65. Since there were 28,080 shares of common stock outstanding, the fair market value of the Leadbetter Company's common stock was $41.21 per share. It is therefore held that the transaction under which petitioner transferred 1,400 shares of Leadbetter Company common stock to the Pittock Leadbetter Company in exchange for securities owned by that company was a distribution pursuant to section 115 (d) of the Revenue Act of 1938 by the Pittock Leadbetter Company to petitioner of $93,114.50 of its capital assets, from which petitioner realized taxable income of $62,814.50. Issue 2. The question in this issue is whether petitioner realized any taxable gain from the transfer of 212 shares of Leadbetter common stock in cancellation of his indebtedness of $21,121.39 to the Pittock Company. Petitioner contends under this issue *176 as he did under Issue 1, that the stock had a fair market value equal to the indebtedness which was retired and that he did not realize any taxable gain. Respondent originally asserted that the Leadbetter stock had no fair market value and petitioner realized taxable income in the amount of $21,121.39. Both parties, however, are agreed now that the determination of this issue is governed by the determination of the fair market value of the Leadbetter common stock as decided under the preceding issue. Since it has been determined that the stock had a fair market value of $41.12 per share, it follows that the 212 shares transferred had a fair market value of $8,717.44, and that petitioner realized a taxable gain of $12,403.95 as a result of the transaction. As a general rule, where a solvent taxpayer settles a debt for less than the full indebtedness, the amount saved on the transaction constitutes taxable income. ; . Where, however, a creditor voluntarily and gratuitously forgives part of an indebtedness, there is no taxable *177 income to the debtor on the amount forgiven. . But, here, there was no voluntary act on the part of the Pittock Company which may be construed to constitute a voluntary forgiveness of part of the debt. The act of that company was the act of petitioner, who was manipulating the affairs of his personal holding company to his own benefit. Respondent is not obliged to acquiesce in that manipulation. . The parties to the transaction were not dealing at arm's length. It is therefore held that petitioner realized a taxable gain of $12,403.95 as a result of the transaction. Issue 3. The question is whether petitioner's income should be increased in the amount of $9,311.96 for interest on the note of Pittock Leadbetter Company. The amount represents interest which accrued from December 4, 1929, to December 31, 1935. The facts are that payment of this amount was not made to petitioner until 1940. At the hearing neither party could explain why this amount was added to petitioner's income for the year 1938. It was stated at the hearing by the Court that *178 it appeared that the evidence introduced by petitioner overcame the correctness of respondent's determination. Since respondent does not argue this issue in his brief, it is concluded that it has been abandoned. Accordingly, it is held that respondent erred in increasing petitioner's income by the amount of $9,311.96. Petitioner concedes the correctness of our determination relating to understatement of dividends received in the taxable year. Decision will be entered under Rule 50.
Footnotes
1. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * * * *
(d) Other Distributions from Capital. - If any distribution (not in partial or complete liquidation) made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property.↩
2. ; ; ; ; ; ; ; ; ; .↩